This is a case on the dock at the student hall. We were told that 297 people are distributed in the water, including Kathleen, Lorenzo, Kate, and June. Which one is one? I don't know. No one? No one. Mr. Christopher McCoy, everyone we have in Lincoln Avenue, please join me. Right here, sir. Mr. McCoy. May it please the court, counsel. My name is Christopher McCoy from the Office of the State Appellant Defender, and I represent Mr. Lorenzo Kent. There are three issues presented today. First, whether the state proved this case beyond reasonable doubt. Second, whether the Facebook evidence was properly authenticated. And last, whether the phone records had a sufficient foundation, as well as whether testimony regarding the victim's cell phone number was hearsay. On the first issue, there are many problems with the state's evidence. However, in the interest of time, I'd like to just highlight the worst of the worst in terms of the contradictions that are present in the state's evidence. And that begins with the testimony of Wesley Johnson, the only supposed eyewitness to the shooting, who is apparently in two places at once, and in neither of those locations would he have been able to see what he claims to have testified to. Genesis Burrell, who is the state's other major witness, testifies that Wesley is eating dinner with her at the time of the shooting. On the other hand, Wesley testifies that he is across the street from the shooting when it occurs. However, is it Wesley's testimony corroborated by Doris? I think it's Denise. Denise saw a person with white clothing pushing a bike across the street, down the street? She does testify to that. There are some problems with that testimony as well. First of all, no one else in the house sees this person in white. She never tells this statement to the police officers. Obviously, it's contradicted by Genesis' testimony. And it also doesn't totally link up with Wesley's testimony in that she says this person has a bag, which Wesley doesn't say he has. She doesn't mention these two other people that are supposedly riding their bikes with Wesley. But even if it does corroborate his testimony, and even if he was standing across the street from the house, again, he couldn't have seen what he claimed to have seen based on the darkness and how the buildings were laid out at that time. And this shows he's wrong about the caliber of the gun. He's wrong about the victim falling down next to a gas meter. He's just not a reliable witness. The victim did fall down next to a cable box. That's not what his testimony is. Well, there's some piece of equipment sticking out from the side of the house, and that's right where the victim was found. And the relationship of the buildings, that garage to the house, is certainly possible that he could have been describing what he saw, that he saw the person go around one side and then certainly would have assumed he came back to the other and slipped through the opening in space between the garage and the house to come back onto the side of the house. I mean, that doesn't seem a far stretch. Well, except that it's too dark for him to see these locations. The police officer, the first police officer on the scene, says it was too dark to see up at the driveway. Doris Gregory, who comes out of the house right after the shooting, says it's pitch dark out. And anyway, Wesley testifies that this shooter jumped over a fence in the backyard, which, as photographs taken by the defense investigator in the daylight show, you couldn't have seen this from across the street. So his testimony is just is, besides being contradicted, is just unbelievable. And Genesis's testimony is also unbelievable, both from the perspective of the actions that she supposedly takes and from the perspective of the actions that the defendant supposedly takes. She didn't know the defendant beforehand, correct? Correct, correct. So she's making all this up about him being involved in an altercation with the victim a couple days before, about children being taken away, all these facts that she knows that match up exactly to what happened a couple days before. Well, they don't match up exactly. She's wrong about the relationship of the parties. But how would she have known it to begin with? I mean, if all the details don't match up, but I mean, if she hadn't had this encounter with him and known this, how could she have made this up from her imagination? Well, she is, this fight that happens a few days before, obviously it happens in the front yard of a house. She's familiar with this neighborhood. She's living in this neighborhood. She could have heard about that. But no matter, again, no matter what her motivation was, her story, it just doesn't make sense. But even if it were to be believed, even if her testimony is accurate, despite all the inconsistencies, what that does is it puts the defendant at the park saying some weird statements to a 14-year-old girl. It doesn't put him at the murder scene. It doesn't put him in possession of the caliber of gun that was used in this murder. And, again, it's just inherently unbelievable. Why would the defendant need this 14-year-old girl in this case? She doesn't give him a gun. She's not a lookout or a getaway driver. What she does is two things. She walks by the victim's house with the defendant walking next to her. And then she makes these phone calls from the park. But there's no reason that any of these things were necessary. There's no evidence that Jackson was holed up in his house, afraid to come outside. And there's no evidence that Genesis was somehow— They had had a fight before then, a couple days before, and there was a knife involved. I mean, why would he want to come out of his house if he saw the defendant walking by? But there's nothing that Genesis is doing to help that. Why would he want to come out of the house because there's some random 14-year-old girl walking by? I mean, and the fact is when she's walking by, so is the defendant, with a coat over his head, which looks more suspicious than anything else. But another question that could be asked, too, is why did Genesis help the defendant? She doesn't know him. He doesn't threaten her with anything. He doesn't promise her anything. She's in public, and yet she never calls out for help or tries to escape until much later in the day. And she's asked that at trial. Why didn't you tell an adult at all that day what was happening? She has no explanation. She says, I don't know. That's her answer. She can't even explain her own actions in this case. But she didn't tell an adult because she wasn't at school when she was supposed to be at school that day. That was the school day, right? She chose not to go to school and to disobey the orders of any adult who was supervising her. So, I mean, that certainly is a plausible reason she didn't want to tell anybody. I think that reasoning becomes a little stretched once you find out this person is trying to kill someone and then you're admittedly scared of this person. And it kind of continues on because after she finally does meet this defendant, then inexplicably, a few hours later, she comes back to the same park where she left an armed man who wanted to kill someone who she just blatantly lied to. And she just comes back to the same location where she left him. Again, none of it makes any sense. And it's also contradicted by the physical evidence. Most notably, she says Mr. Kent has this large black tattoo on his neck. There's no evidence he has any such tattoo. And she's contradicted by the other state's witnesses, by her own prior statements. In fact, the state, in its brief, at least by my count, points out 14 times where Genesis was contradicted in her trial testimony. The state calls her testimony in its brief, quote, confusing and contradictory. This is the state talking about its main witness at trial. So even in light most favorable to the state, this is not a reliable narrator. This is, you just cannot trust her testimony when so many details are wrong and there are so many contradictions. And all of these contradictions were put before the jury and argued to the jury, correct? Yes, but that doesn't mean that the jury's decision is reasonable. And that's why they're, this court didn't review the sufficiency of the evidence. I understand we review the sufficiency of the evidence, but we do it with a certainly deferential eye toward the jury's verdict and whether there's evidence to support that. And you're pointing out contradictions which certainly are there and the state admits are there. But the issue is you also have to look at any corroboration, correct? Yeah, take the evidence in the light most favorable to the state. Take the evidence and look at it. Could a rational fact finder have found this man guilty? And when the only eyewitness is testifying to things that are physically impossible, and that's a quote from another state's witness, physically impossible. It's just it's not rational to, again, even in the light most favorable to the state, to find Mr. Kent guilty. And on top of all of this, we have the evidence that Jackson was dealing drugs from his house. Obviously, drug dealing is a hazardous profession. I'm sure this court has seen countless cases where people get shot or killed over selling drugs. So there's a motive wholly separate from Mr. Kent. And this is confirmed by the neighbor, Shannon Waters, who testified that she saw two people going through the victim's pockets right after the shooting. Could we turn for a minute to the Facebook evidence and whether or not there was a proper foundation? Didn't we have certainly sufficient foundation for the screenshot to go to the jury? The judge is just the gatekeeper. We had testimony by the detective that the defendant's nickname was Lucky. That certainly is on the exhibit. We also have, and CASEL supports, the facts and circumstances establishing that the witness, Genesis, knew the defendant as Lucky. We have the information on the exhibit that would tie the screenshot or the piece of evidence to what happened. That is, the victim was found dead in his driveway. Why is that not enough as a foundation? In other words, again, for the judge as gatekeeper to then send this question to the jury and the jury to give whatever weight it deems appropriate to that piece of evidence. Well, our position is no, that there was not sufficient authentication. Why is there not sufficient? What's missing? Well, there's lots of things missing to address some of the points. First, yeah, the judge's role is a gatekeeper, but his role as a gatekeeper is essential. And this comes from the Sublette case that we cite out of Maryland. The court's role as a gatekeeper is essential because the jury assumes on site all else that is implied about an object. So it's not just sufficient to say, to kind of throw, for the court to throw his hands up and say, well, we'll let the jury figure it out. The judge has a role as gatekeeper to prevent evidence that is not reliable from going to the jury. Now, in this case, context is important. This is social media evidence that presents unique challenges that are not presented by more traditional types of evidence. Obviously, there's no handwriting. This post is not in a specific location. There's no back and forth communication between people that's in an email or a text message. And then you have the general anonymity of posting things on the Internet. So it's for this reason that the Supreme Court of Mississippi in the Smith case said that there is, when you're dealing with social media evidence, a high potential for fabrication. So against this backdrop, the state is three factors. As you mentioned, the profile name, the picture and the post itself. First of all, the profile name and the picture tell us next to nothing. Yes, there is testimony that Mr. Kent's name, nickname was Lucky. That testimony comes only from Genesis. The only reason that Detective Beets knows this nickname is because it's what Genesis told him. The only reason Michaela knows this nickname is because it's what Genesis told her. And as I said, there's many reasons to question Genesis's veracity in this case. But beyond that, there's no accuracy checks on Facebook. We know that someone can create a fake profile with a fake picture because that is exactly what the police officer did in this case. There's no other evidence about the Santos profile, such as when it was created, where it was created. There's no IP address linking this to the defendant. There's no evidence of any other post that this profile ever made. It could have been created by really anyone, anywhere in the world. So essentially, and I should take a step back. So the picture and the profile name are not enough. And that is what is held, again, in the Smith case and the Vayner case, which we cite both of those cases in our brief. Well, we have more than that here. Right. So really what the state is left with is the post itself. OK, but the post itself is just too vague to say that the defendant was the author. First of all, it's hard to tell what it means. As defense counsel said, this could be song lyrics. Someone who knew nothing about this case could have written could have written this post. It says nothing about Camilo Wilson. It does not say the victim's name, does not say anything about the prior fight over the children, doesn't say anything about a gun or a shooting. There are no specific details that only the murderer would know. It's two words, dead and driveway. And that's just not sufficient to say, especially given the problems with social media, it's not sufficient to say that that is enough to authenticate it as being from the defendant. Except the circumstance. There's three words, him, because it's a male. Again, no evidence that only the murderer would know. And this post is made a day after the murder. And at that point, many states have many state's witnesses knew about this murder. They knew where the victim was found dead. And it is that's exactly the same situation we have again in Smith and Vayner. In those cases, the courts held that because other people knew this information, particularly other state's witnesses, this was not the social media evidence was not authenticated. Here, again, it's just too vague. And there's ultimately nothing distinctive enough to warrant the admission of this evidence. Unless we take into account the circumstances of everything that happened, and you discussed a lot of that in your first argument. But again, I guess my question is why, I mean, given what we have here, together with the circumstances of what occurred, why shouldn't the jury be the one to decide what weight to give to all of that, given the fact that we have at least what you've elaborated? Well, that's why authentication is needed to begin with. Because otherwise, there'd be no requirement for a foundation for any evidence. The reason you have authentication is so that there is enough evidence to say, to get it before the jury. And here, that's just, there's just not that. There's really two questions. Who wrote this post and what does it mean? And it's sort of, the state has sort of circular reasoning and bootstrapping, if you will. Because to find that the post means what the state says it means, you have to assume that the defendant is the murderer to assume, to find that he's the author of the post, which then is used to prove the defendant is the murderer. So, again, it's just circular reasoning and there's nothing, no specific information. Did defense counsel object to the admission? Yes. Both in at trial and in the post-trial motion. Actually, before trial, at trial, and in the motion for new trial. Okay. You'll have an opportunity to make rebuttals, sir. Thank you. Mr. Cook? Thank you, Mr. Court. Joan Kripke on behalf of the people of the state of Illinois. Counsel. I would first like the court to direct the court back to our brief to the standard of review. And I'm not going to go over it. I know it's familiar to you, but I think it bears looking at again, especially in terms of circumstantial evidence. Because this is clearly a circumstantial evidence case. We front in our brief that. Didn't Wesley say he saw the defendant? Well, he didn't say the defendant. He didn't pick him out of the lineup or identify him at trial. So does that make him circumstantial? Because he saw someone, he testified he saw someone shoot the victim. Right. He said he saw them. He was shown a lineup. He picked the defendant and another man out, but said he could not conclusively determine which one was the man he had seen, even though he had seen the defendant in the park. But I think what the court really needs to focus on is the testimony of the two girls. Because both, these are what the two girls knew that there's no reason that they should know this information. They both ID'd the defendant in a photo lineup and they ID'd him in court. Both girls knew the defendant only by his nickname Lucky. And I believe that Michaela must have heard it. I can't remember exactly, but I don't believe if Genesis might have introduced him as Lucky, but the man responded to the name of Lucky. So she knew that. She was able to tell that to the police. Both girls knew the defendant had been in an altercation with Don over custody of his children. Who are these kids? Why would they know that? There's absolutely nothing in the record to substantiate defendant's assertion, well, it was a public argument that happened the day before, two days before, and Genesis, you know, was wandering around the neighborhood. There's nothing in the record to indicate that she was there on that day. And in the case in which the defendant was charged with mob action, in which the conviction was reversed in this court, her name never comes up anywhere in that record. So that's just, it's just nowhere in the record in this case or the prior case. So there's no reason that Genesis ever would have seen that altercation. Both girls knew the defendant wanted to kill Don because he kept saying it repeatedly. Both girls knew defendant had used Michaela's phone and the phone had been charged at the park. And this is really key. The defendant wanted a phone. Genesis didn't have a phone, but she said, I've got a girlfriend who's got a phone. And that's how Michaela gets dragged into this whole mess of the defendant using her phone and her meeting the defendant and her being able to ID him and know that he's mad at some other man and it's an altercation, it's a dispute over his children. And they both also knew, some were in there, the fact that they knew that the altercation had to do with the children being taken away by DCFS. This was information that was corroborated by Deshaun Thompson, the defendant's friend, and Doris Gregory, excuse me, the victim's friend and the victim's girl, and by Doris Gregory who was the victim's girlfriend. Because both of them had been present the day before when this altercation had taken place. And another reason to say that it wasn't just some altercation was the fact that both of them testified that they saw the defendant at that altercation with a knife, and both of them heard the defendant threaten the victim that he was going to kill him. Genesis also saw the defendant with a gun. She said he said it was a .38. I don't know if this child knows anything about guns.  Also, both girls knew the defendant had braids, and Mikayla ID'd the backpack as one the defendant had with him at the park. And this backpack that she identified had been confiscated as part of evidence by Scott Mastriolani, who arrested the defendant at Kanika Wilson's apartment. And that backpack had come from her apartment, and therefore the defendant had access to it. And she was able to say, she said, yes, I remember it because of the colors. Unfortunately, in the record, I don't believe they have a picture of it, and there was a discrepancy between the girls about the backpack. And there were all kinds of discrepancies, but these facts are essential. These are key. These are things that you just can't why would how could somebody have just made, and this 13-year-old child made this up out of nowhere. It just makes no sense, especially given the fact that the altercation was confirmed and corroborated. We know it from the police. We know it from the record. We know it from the two witnesses. Do you agree with the defendant's argument that it would be impossible for Wesley to see what he said he saw? I don't know. I didn't see it. And from the pictures that are there, I don't know. I don't see a person standing there. I mean, Wesley said, I saw a shooting happen. And what was interesting is that Wesley described coming over a fence. I can't remember, but I believe there was a – and he mentioned a gate. And when you look, there was like a gate that abutted to the – abutted the garage. And they also found bullets out there. And he said he saw the guy come out shooting, and they found bullets out in the grassy area. Did they find bullets or empty cartridge cases? I'm sorry. Empty cartridge cases. Thank you for that correction. And Wesley said – also said, again, what Denise Gregory – he said, I was wearing white. My bicycle had broken. I was holding – he wasn't holding a bag, but he said he was holding something. It could have been the chain, actually, because the chain had fallen off. And he said, I was pushing, walking the bike, and I saw the shooting happen. Okay. I'm not sure Wesley said or anybody said that he was eating dinner with Genesis. I know Genesis testified that she was eating dinner and that Wesley's father had made it. Whether Wesley was at the table, I'm not really sure. She testified that Wesley was there when the shots went off. Oh, okay. All right. So then that would be a contradictory piece of evidence. If you don't mind, can we shift gears to this Facebook post for a minute? Yes. Is that enough, the picture, the name, and the content of the post to authenticate this as coming from the defendant or someone at the defendant's direction? I think it is. I think it is in this case based on the Downing case, which says if it has an obscure fact, it's only going to be known to a very limited number of people. But the limited number are people that might have an ax to grind against the defendant or might have a reason to pin this on the defendant. Because there are a number of people who know that he was shot in his driveway, correct? I'm sorry, can you say that again? There were a number of people who knew that he was shot in his driveway. Correct. But the only ones that testified were Doris Gregory and Deshaun Thompson wasn't there. And she didn't, there was no, they didn't ask her. Prior to trial, the state said that they, the court said, what are you going to use for foundation? The state said we're going to prove it up with information, which they never proved it up with. One would say we're going to say that Santos was the defendant's mother's maiden name. Okay, never got proven up. They also said the IP address came back to Kimiko Wilson. Never proved it up. Even if they had proved up that particular fact, in this particular case, I don't think that, and I am not a tech person. From my understanding, in this particular case, I don't believe even having the IP address would have been enough, standing on its own, to say the defendant wrote this post. To me what is key is the fact that, how did the police officer search? He searched by using the name Lorenzo. Not an uncommon name, but probably not in the top ten common names that are given to men. And tied in with the fact that Lucky, the guy's nickname, was also in there. And we know that that was his nickname. The girls testified to it. It's the only name they knew this man by, the defendant by. Then there was a picture. The police officer said the picture was sufficient for him. It was blurry, yes, but to him it looked like the defendant. But the person in the picture had braids, and both the girls testified that the defendant had braids. But what I think is really the linchpin in this is this, it's my way or the highway, leave him dead in his driveway, which is exactly what happened here. And this post came up less than 24 hours late. And we don't even know when it came up, but the police officer discovered it, he said, around 2 p.m. the next day. What also was important is after he took the screenshot of it and apparently went back online, it was gone. I researched this and could not find anything on it. I would argue with no basis except for an analogy that this is tantamount to the destruction of evidence, which would also indicate a consciousness of guilt. I think you can make those presumptions from that. And if it stood up there and it stayed on the web, that would be different. But here you have somebody who put it up and then might have had second thoughts and said, uh-oh, or somebody looked at it and said, what are you doing? You're confessing, they'll find you and take it down. You would agree that in Vayner there was information in the post that certainly tied it to the criminal acts of the defendant, correct? I mean, you'd agree that that was in there. My question to you is do you believe Vayner was incorrectly decided? To tell you the truth, I'd have to go back and re-read Vayner. I would be happy to re-read that or to look at it again, but standing here I just don't remember it well enough to say yes or no either way. What I do think, though, is that this is an obscure enough fact known only to a few people. And here, yes, there might have been people who wanted to frame the defendant because they were mad at him, but there's no evidence of that anywhere. There's no testimony. I mean, the only people who were at that house that we – well, I'm sure we have the next-door neighbors who suspect he was a drug dealer, the nosy next-door neighbors, but there's no proof of it. Anybody could have been the owner of those drugs that were found at the place, and it doesn't necessarily – I know in another circumstance I would say it is, but it doesn't necessarily – it's not necessarily indicative of dealing. It might have been, but it could have been anybody in that household. And regardless, isn't that sort of – I mean, it may – drug dealing indeed would bring unsavory characters to your house if you're dealing out of the house, but there is nothing substantiating that except for the suspicions of the next-door neighbors. Well, there were drugs found in the sprinkler. Right, but there were a lot of people living in that house. We don't know to whom they belonged. They used an analogy in Vayner, and I'm going to post that analogy to you, and that is had this post just been on a piece of paper found on the street in front of the defendant's house, in front of the victim's house, wherever, would it be admissible? Would it be authenticated? You mean the post with the guy's name and everything else? Yeah, basically the screenshot that the officer took that we have in evidence here, if that piece of paper, that screenshot was just found on the street, just laying there on the street. Who found it? When was it found? I mean, you have to give me – I mean, it's just out there blowing around in the wind. Well, okay, let's put it – I mean, it was found at the same time that the police officer found this one, at the exact same time, by just some random person on the street. Interesting. Is that authenticated based on the content of it? Because we have evidence here in the record that the officer made up his own Facebook page. Correct. It was totally fictitious. Correct. Fictitious picture, fictitious name, fictitious everything. So you could do it. I mean, I think it's in the record. I think everybody kind of tells you that anybody could – I could make a Joan Kripke Facebook post page, correct? I mean, you know, I'm just saying, anybody could do that. And it's in the record. So my question again, in analogy, if it was just found on the street. I'm not even sure you can – I mean, I have to think about whether you can analogize, you know, something floating in the wind, a tangible thing, versus – again, yeah, I suppose you can do that. But I – Well, this is theoretically floating in the wind. Right, I understand that. Because what I'm saying is there's evidence in the record that this could be created by somebody totally unrelated to the defendant. And just because it has his name on it – again, if we had the IP address, if we had, you know, the name of his mother would have been helpful, but the IP address certainly would have been very helpful. But here's the deal with the IP address. The IP address – let's say the IP address is proven up to come back to Kimiko Wilson. So who wrote it up? Did she write it up? Did the defendant write it up? Did other people wandering in and out of the apartment write it up? Did her kids – the kids who were living there? I don't know how old they were. Did they write it up? Well, it's a step closer. It's a step closer. But in this day and age, when there were only computers that sat on your desk, then you could say, okay, that belongs to this person. But now everything's linked and everything's portable. And people walk around with all these devices. The example – we were discussing it. The example that I was laughing at was recently the man who was the former governor of Alabama who's sending love notes to his mistress so clueless that he doesn't know that his computer or whatever he was texting her on was linked to his wife's iPad, who was reading these messages. So, again, how the court is going to look at what it takes to do this I think goes back to Downand. And you can't make the analogy between a piece of paper floating in the wind versus something that – well, I don't know. I hate to go there. But you have to go back to Downand and look at what Downand says about this obscure fact. And I think you're going to have to hang your hat on whether or not you think this obscure fact, known only to a very few number of people, came up the next day and was – and I think you also have to look again at what I said. It was deleted almost soon after it was discovered, which is, in some effect, could be considered a destruction of evidence and could be consciousness of guilt. May I – I realize the time is way over. The fact it was taken down wouldn't have precluded later investigation to determine where it came from. Is that correct? From what I understand, I suppose, of the people who know how to go into – Well, if this was a true web shot, the URL should have been in the picture too. And if there's a URL there, it would seem to me you could figure out what the IP address was based upon that. Whether they could or they couldn't, they just didn't present the evidence. Or at least they would give you enough information to go find out where it was. Well, I'm sure that they could also have done whatever you have to do to go to Facebook and find out who owns these things. But apparently it wasn't done in this case. May I make argument on the telephone numbers? Pardon? May I make the argument on the telephone numbers and Doris Gregory's testimony? What's your – do you want to listen? Okay. Go ahead. Thank you. The telephone logs that belong to – that pertain to Michaela Allen's telephone were authenticated properly as a business record. And the defendant agrees with that. And those follow the Illinois Rules of Evidence. What was not authenticated comes from case law in which they say these were computer-generated records and you have to then go a step further and you have to have an affidavit from the company that tells you more about the computer and it was in working order and all this other type of stuff. But there's case law that says if you don't get that affidavit, it doesn't boot the information. You can prove it up by other extrinsic evidence. And the other evidence that corroborated or authenticated these phone records was the testimony of the two girls who said these phone calls were going on. I mean, why was Michaela Allen there? She was there for one purpose only. Genesis Burrell knew she had a phone. The defendant wanted a phone because he wanted to call the defendant. And he was making phone calls. Both the girls testified. Their testimony was not necessarily identical about who talked, who didn't talk, whether she answered them. The fact of the matter is that multiple short telephone calls were made. And when they got the telephone records back, yes, that was shown. And it was something like 4 o'clock in the afternoon to something like 4.30, which would coincide with about the time the girls said the phone calls were making. They never said the time, but if Michaela Allen got off the bus around 2, they walked back to the park, she charged her phone. This would all, it wasn't like they were having it 8 o'clock at night or 3 in the morning or some other time. It was after school time when the girls would seem to have been in the park with the defendant. So that alone overcomes the problem regarding the authentication of the telephone records without having that extra affidavit. And just as an extra thing that I would like to throw in is the problem with that type of standard that they, that the case law is imposing is this. It sounds like they're trying to make it a standard that we use with breathalyzers. The difference is that in a case where a breathalyzer is, the rules about authenticating the breathalyzer results are, those are machines that are in the, that are, belong to the state. And the state has a protocol and knows how to service them and how to keep a record and can bring people in. These are records that you're asking from a corporate entity that is in another state over which you have no jurisdiction. And you can't demand that they produce something even if you subpoena it. If this is what they're going to give you, this is all you can get. And so in this particular case, if you're going to use that other case law that says you need an additional authenticating standard, the outside evidence of both of the girls saying these telephone calls were going on at that particular time is sufficient to back up that the computer-generated records were okay. I have one quick question. Yeah. You argue at page 45 of your brief basically harmless error at the top of page 45 on this issue, correct? Correct me if I'm wrong. You do not argue harmless error on the Facebook posts? No, I don't. Okay. But I will say as to both these two evidentiary issues, even if the Court finds that, this Court finds that the trial court used improper reasoning in allowing the pieces of evidence, these things into evidence, the result was appropriate even if the reasoning was not appropriate. Because in the end, we believe that both the phone records and Doris, what I'm going to get to about Doris Gregory's phone numbers, and the Facebook page all should have been admitted, although also based on just the testimony of the girls, we believe we proved the defendant guilty beyond reasonable doubt. Why wasn't the defendant prejudiced by the Facebook? Because the page, assuming the trial court shouldn't have, there wasn't sufficient foundation. On what basis are you saying, making your argument now? That he's not, that he's not, that this wasn't a sufficient foundation? Well, if you're saying it's an insufficient foundation, that you can't relate it back to, and then it can't be related back to the defendant, I mean, this was information before the jury. They were looking at it only for its weight. And its weight, if you're saying the weight was so insufficient or the foundation was nebulous or not that strong, then perhaps the jury didn't give that much weight to it. And what they really had to look at here was these two girls telling a story about a guy that they don't know, and there's no reason that they should know. So are you saying that the evidence was overwhelming then? I think that the evidence, no matter how squirrelly it came out, through these two 13-year-old kids, one of whom is a runaway, I think it was very strong, overwhelming, I think it was very strong evidence, because there's nothing, nothing refuting the fact that these girls made up a story that happened to have been corroborated by two eyewitnesses and the police. I mean, they went, and how did they even get to Genesis Burrell? Well, the police picked her up because she was a runaway, and according to the record, he started talking about the shooting because it happened in the neighborhood, and she's like, I know all about this, let me tell you about this guy I met in the park. So she offered up the information. Going back to Doris Gregory, when Doris Gregory was- Do we have any questions? No, but I guess I'd just like to hear the last comment with respect to this. So Doris Gregory was interviewed the same day as the shooting, I believe it was the next day, and at that time, they asked her if the defendant had any cell phones, and she said yes, he had both his mobile phone and he had an iPhone, and here are the numbers. When she testified, and the police officer, David Swanson, wrote them down in his report, and he said, I wrote them down in my report, and he knew what the phone numbers were. She could not remember the phone numbers at the time of the trial. Okay. The importance of David- It turns out that those phone numbers that she gave are the phone numbers that show up in McKayla- or at least one of them for sure- showed up in McKayla Allen's phone records. So what did the police officer do? He said, I took these numbers, and it shows his course of investigation, what he did with the phone numbers. She's telling him the phone numbers belong to the decedent. He's going to try and verify that. Turns out they come back to somebody in California and a business in Texas or people in different states. The decedent's name is not associated with either phone number. So it's not being admitted for the truth of the matter asserted because it never does prove up the truth of the matter asserted. And what happens is it just shows what the police officer did in his investigation. He took those phone numbers, and he went to find out to whom they belong. Turns out they didn't belong to the defendant, but he was able to match them up, and it shows how he was able to match them up with McKayla Allen's phone numbers. Excuse me, phone records. And that's how the link comes in. And the jury had this information before. And for all of these reasons, we believe that we proved the defendant guilty of the unreasonable doubt. Thank you. Mr. McCoy. One point on the reasonable doubt issue. Closing counsel argues that how do we know these were Jackson's drugs? Well, Desiree Gregory told a police officer that night that Jackson kept the drugs he sells and told the officers he should look in the bushes next to the garage, which is where the drugs are found. So it can't even be argued that these are not Mr. Jackson's drugs, and he's not the one selling them. Turning to the Facebook evidence, to answer Justice Zinoff's question from earlier, this is a quote from page 32 of our opening brief. Leaving a jury to consider potentially untrustworthy evidence is precisely what the court's role as gatekeeper is designed to prevent. And this Facebook evidence was untrustworthy. The counsel points out all the deficiencies that there would be if we had the IP address. Those deficiencies are magnified a billion-fold when we don't have the IP address. Instead of tying it to one specific house, it's anyone in the world. And, Justice Burke, as you pointed out, the name doesn't mean anything. Anyone can create a Facebook profile with any name. And counsel also cites Downan. Downan deals with a much different factual scenario. In Downan, the, excuse me, there was e-mails. And the way they were authenticated was because the witness, the complainant, communicated with the defendant over e-mails before and after meeting him in person. So she e-mailed the defendant and said, we're going to meet at this location. She went to that location, and there was the defendant. That's corroboration. Nothing like that in this case. Downan deals is a complete higher level of circumstantial evidence that's, again, nothing, nothing like what we have here. And further, one last point on the Facebook evidence. Counsel did not argue harmless error in her brief. This argument has been forfeited for appeal. And besides that, harmless error flies in the face of the state's actions, from the motion in Lemonade all the way to this appeal. The state was the one trying to get this evidence in, filing a motion in Lemonade. The state was trying to put this before the jury. I mean, it shows how desperate the state is in this case. They're relying on this very vague phrase. And then they rely on it in closing arguments, including the very first words of closing arguments. And they treat it as a confession to murder. When we have this extremely weak case, a confession to murder cannot be harmless. Is the record clear as to how Lucky spelled his name? No, no. I mean, the ROPs spell it as L-U-C-K-Y. There's no indication that he spelled it with two I's. And additionally— But it's two I's on the Web page. Correct, correct. We don't know. Again, all we know about him going by this name is from what Genesis testifies to. Michaela only knows it because Genesis told her that. We don't know that he regularly goes by this nickname. We don't know that he goes by the last name Santos. None of that. And then finally, on the record about the phone issues, obviously there's two problems. The records should not have been admitted. And counsel argues about case law that would allow the girl's testimony to corroborate this evidence. Counsel did not cite that in her brief. I am not aware of any such case law. And honestly, what the state needed to show was not a high bar. They needed to show the computer was accurate and operating properly. Zero evidence. Zero evidence about the computer that produced these records. And the state's argument is just trust us, this record's good enough. But even if it was admitted—and this gets to the second problem with the phone records— the key for the state is tying the phone number Michaela called to Jackson's phone number. And they do it through Swanson's testimony. Now, I think it's a bit disingenuous for the state to argue this was not proved for the truth of the matter asserted. They argued in closing as for the truth of the matter asserted that this 773-800-5921 was Jackson's phone number. So it's hearsay. It's coming in for the truth of the matter asserted. And the fact—the recorded recollection exception doesn't apply. The fact that—because there's two—there's an additional level of hearsay within the report. It's—what's recorded is what Swanson was told by Doris. So there's this extra level of hearsay. If he hadn't written this in his report, obviously it's hearsay. He can't testify it. The fact—can't testify to it. The fact that he writes it in his report, it doesn't erase the second level of hearsay. It's still there. And besides the fact that the state didn't use this exception in the correct way, there's nothing— nothing there that should have admitted or allowed for Detective Swanson's testimony. Unless there are any further questions. Mr. Pankhurst. Any questions? No. I respectfully request that this court reverse its conviction and remain in its case during trial. Thank you. Thank you. We'll take the case under advisement. We'll take a short recess. There's another case in the fall.